**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| INTELLECTUAL VENTURES I LLC and INTELLECTUAL VENTURES II LLC, | Civil Action No. 6:23-cv-00307-ADA |
| Plaintiffs, | ▮▮▮▮▮▮▮▮▮▮ |
| v. | |
| LENOVO GROUP LIMITED, | |
| Defendant. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S**
**MOTION TO EXCLUDE PORTIONS OF EXPERT TESTIMONY**
**PURSUANT TO *DAUBERT* AND MOTION TO STRIKE**

**TABLE OF CONTENTS**

I.     THE APPORTIONMENT TESTIMONY OF DR. MCCLELLAN, DR. LOMP, AND MR. BLOK SHOULD NOT BE EXCLUDED............................................................ 1

    A.     The Apportionment Analyses of Dr. McClellan and Dr. Lomp Apply Well-Known Methodologies, Are Tied to the Facts of the Case, and Should Not Be Excluded............................................................................ 2

        1.     Dr. McClellan's Apportionment Analysis. ................................................. 2

        2.     Dr. Lomp's Apportionment Analysis. ......................................................... 9

    B.     Mr. Blok Properly Relies on the Opinions of Dr. McClellan and Dr. Lomp........ 11

        1.     Mr. Blok's Reliance on Dr. McClellan's Opinions. ................................. 11

        2.     Mr. Blok's Reliance on Dr. Lomp's Opinions......................................... 14

II.    IV's ARGUMENTS THAT THE '835 AND '439 PATENTS ARE STANDARD-ESSENTIAL WERE TIMELY DISCLOSED AND SHOULD NOT BE STRICKEN ....................................................................................................... 16

    A.     IV Explicitly Identified the '835 and '439 Patents as Standard-Essential in its Infringement Contentions.......................................................... 16

    B.     IV's Position Has Remained Consistent Throughout this Litigation.................... 18

III.   MR. BLOK'S DAMAGES OPINIONS FOR THE '835 AND '439 PATENTS SHOULD NOT BE EXCLUDED ................................................................. 21

IV.    IV IS NO LONGER ASSERTING THAT OPENVPN INFRINGES ANY PATENT CLAIM ...................................................................................... 22

V.     DR. LOMP DID NOT INTRODUCE A NEW THEORY OF INFRINGEMENT FOR THE '835 PATENT ..................................................... 22

    A.     Background. ...................................................................................... 22

    B.     Argument. ......................................................................................... 23

        1.     835 FICs State that Claim Element [1.c] Is Met by Providing DQS Signals for LPDDR4/4X and WCK Signals for LPDDR5. ..................... 23

        2.     Dr. Lomp's Infringement Analysis Is Consistent with the '835 FICs................................................................................................... 25

VI.    IV DISCLOSED ITS THEORIES OF, AND SUFFICIENT FACTS REGARDING, SECONDARY CONSIDERATIONS DURING FACT DISCOVERY........................................................................................... 26

VII.   CONCLUSION.............................................................................................. 28

**TABLE OF AUTHORITIES**

**Cases**

*BB & T Corp. v. U.S.*,
   233 F.R.D. 447 (M.D.N.C. 2006) .................................................................................. 27

*Cioffieta v. Google, Inc.*,
   No. 2:13-cv-00103-JRG-RSP,
   2017 WL 77395 (E.D. Tex. Jan. 9, 2017).................................................................... 13

*In re Innovatio*, LLC Patent Litigation,
   No. 11-c-9308,
   2013 WL 5593609 (N.D. Ill. Oct. 3, 2013) ................................................................ 15

*LongHorn HD LLC v. NetScout Systems*,
   No. 2:20-cv-00349-JRG-RSP,
   2022 WL 903934 (E.D. Tex. Mar. 27, 2022) ..................................................... 2, 12, 14

*Mobile Telecomms. Techs., LLC v. Blackberry Corp.*,
   No. 3:12-cv-1652,
   2016 WL 2907735 (N.D. Tex. May 17, 2016) .............................................................. 27

*NetFuel, Inc. v. Cisco Sys. Inc.*,
   No. 5:18-cv-02352-EJB,
   2020 WL 1274985 (N.D. Cal. Mar. 17, 2020).............................................................. 8

*Odyssey Wireless, Inc. v. Apple Inc.*,
   No. 15-cv-1738-H-RBB,
   2016 WL 7644790 (S.D. Cal. Sept. 14, 2016).............................................................. 1

*Personal Audio, LLC v. Google LLC*,
   No. 17-1751-CFC-CJB,
   2021 WL 5038740 (D. Del. Oct. 25, 2021) ................................................................. 8

*Pisony v. Commando Constructions, Inc.*,
   No. 6:17-cv-00055-ADA,
   2020 WL 4934463 (W.D. Tex. Aug. 24, 2020)............................................................ 27

*Plastic Omnium Adv. Innovation & Rsch. v. Donghee Am., Inc.*,
   387 F. Supp. 3d 404 (D. Del. 2018).............................................................................. 1

*Realtime Data LLC v. EchoStar Corp.*,
   No. 6:17-cv-00084-JDL,
   2018 WL 6266301 (E.D. Tex. Nov. 15, 2018) ...................................................... 12, 14

*Realtime Data, LLC v. Oracle Am., Inc.*,
   No. 6:16-cv-00088-RWS-JDL,
   2017 WL 11574028 (E.D. Tex. Mar. 30, 2017) ..................................................... 2, 13

*Salazar v. HTC Corp.*,
   No. 2:16-cv-01096-JRG-RSP,
   2018 WL 1783157 (E.D. Tex. Apr. 13, 2018)...................................................... 12, 13, 14

*SB IP Holdings, LLC v. Vivint, Inc.*,
No. 4:20-cv-00886,
2023 WL 6601415 (E.D. Tex. Oct. 10, 2023) ........................................................ 2, 6

*Semcon IP Inc. v. MediaTek Inc.*,
No. 2:16-cv-00437-JRG-RSP,
2018 WL 4501871 (E.D. Tex. Feb. 28, 2018) ........................................................ 27

*Sigman v. CSX Corp.*,
No. 3:15-cv-13328,
2016 WL 7444947 (S.D.W. Va. Dec. 27, 2016) ..................................................... 27

*Sioux Steel Co. v. Prairie Land Mill Wright Serv.*,
No. 1-cv-2212,
2022 WL 17184469 (N.D. Ill. Nov. 23, 2022) ........................................................ 1

*Smart Path Connections, LLC v. Nokia of America Corp.*,
No. 2:22-cv-0296-JRG-RSP,
2024 WL1096093 (E.D. Tex. Mar. 13, 2024) ......................................................... 6

*StratosAudio, Inc. v. Volvo Cars USA, LLC*,
No. 6:20-cv-1129-ADA,
2022 WL 1261651 (W.D. Tex. Apr. 28, 2022) ....................................................... 27

*Summit 6, LLC v. Samsung Elecs. Co., Ltd.*,
802 F.3d 1283 (Fed. Cir. 2015) ............................................................................. 15

*Voxer, Inc. v. Meta Platforms, Inc.*,
No. 1-20-cv-00655-LY-SH,
2022 WL 3371634 (W.D. Tex. Aug. 16, 2022) ...................................................... 7

*WhereverTv, Inc. v. Comcast Cable Communications, LLC*,
No. 2:18-cv-529-JLB-NPM,
2022 WL 2115487 (M.D. Fla. Jun. 9, 2022) .......................................................... 5

*Wonderland Nursery Goods Co. v. Thorley Indus., LLC*,
No. 12-cv-196,
2013 WL 6328772 (W.D. Pa. Dec. 5, 2013) .......................................................... 8

**Rules**

Fed. R. Civ. P. 30(b)(6) ............................................................................................... 28

**Other Authorities**

Neyman, J. and Pearson, E.S.*,*
*On the problem of the most efficient tests of statistical hypotheses*,
Philosophical Transactions of the Royal Society of London,
Series A. 231:289–337 (Feb. 16, 1933),
*available at* https://doi.org/10.1098/rsta.1933.0009 ................................................. 3

van der Laan, M., *Statistical Inference for Variable Importance*,
The International Journal of Biostatistics, Vol. 2, Iss. 1 (2006),
*available at* https://doi.org/10.2202/1557-4679.1008 ............................................... 3

iv

Zien, Alexander, *et al.*,
  *The Feature Importance Ranking Measure* (Oct. 22, 2018),
  *available at* https://arxiv.org/pdf/0906.4258 ............................................................................... 2

Plaintiffs Intellectual Ventures I LLC and Intellectual Ventures II LLC (together, "IV") oppose Defendant Lenovo Group Limited's ("LGL") Motion to Exclude Portions of Expert Testimony Pursuant to *Daubert* and Motion to Strike, Dkt. No. 125 ("Mot."). Numbered exhibits cited herein were attached to LGL's Motion. Letter exhibits cited herein accompany this Opposition.

## I.    THE APPORTIONMENT TESTIMONY OF DR. MCCLELLAN, DR. LOMP, AND MR. BLOK SHOULD NOT BE EXCLUDED

LGL argues that the apportionment opinions of Dr. Lomp and Dr. McClellan, IV's technical experts, are "plucked out of thin air," and "untested and unreliable, with an unknown error rate," and therefore should be excluded. Mot. at 7-8. LGL also asks the Court to exclude the royalty opinions of IV's damages expert, Mr. Blok, which rely on the opinions of Dr. Lomp and Dr. McClellan. *See id.* LGL's claims are based on misrepresentations of fact and legal theories that are inconsistent with the applicable law.

An apportionment analysis is necessarily at least somewhat subjective, and must be based on the experience and judgement of the expert to some degree. *Sioux Steel Co. v. Prairie Land Mill Wright Serv.*, No. 1-cv-2212, 2022 WL 17184469, *7-*9 (N.D. Ill. Nov. 23, 2022) (citing *Plastic Omnium Adv. Innovation & Rsch. v. Donghee Am., Inc.*, 387 F. Supp. 3d 404, 414 (D. Del. 2018)). This is especially so in cases like the instant matter, in which the inventions at issue are not standalone products, but instead are directed to particular features that are incorporated into complex devices (*e.g.*, smartphones or laptops). *Odyssey Wireless, Inc. v. Apple Inc.*, No. 15-cv-1738-H-RBB, 2016 WL 7644790, *7-*8 (S.D. Cal. Sept. 14, 2016). In such cases, courts routinely find that if an apportionment analysis is tied to the facts of the case, carefully documented, and results in a demonstrable apportionment of the accused functionality from the non-infringing features, then it is sufficient. *SB IP Holdings, LLC v. Vivint, Inc.*, No. 4:20-cv-

00886, 2023 WL 6601415, \*2-\*4 (E.D. Tex. Oct. 10, 2023). Both Dr. Lomp and Dr. McClellan's apportionment analyses meet these criteria, and so the Court should deny Defendant's motion.

LGL also asks the Court to exclude the damages opinions of Dr. Blok solely because he relies on Dr. Lomp's and Dr. McClellan's apportionment analyses. The Court should not be persuaded by LGL's arguments because they mischaracterize Mr. Blok's opinions in a manner inconsistent with applicable case law. Damages experts are routinely permitted to rely on the technical opinions of technical experts as part of their analysis, including apportionment. *LongHorn HD LLC v. NetScout Systems,* No. 2:20-CV-00349-JRG-RSP, 2022 WL 903934, at \*3 (E.D. Tex. Mar. 27, 2022). This is particularly so when a technical expert's apportionment analysis is one input into the damages expert's opinion about the proper apportionment value. *Realtime Data, LLC v. Oracle Am., Inc.,* No. 6:16-cv-00088-RWS-JDL, 2017 WL 11574028, at \*5 (E.D. Tex. Mar. 30, 2017). Mr. Blok's damages opinions are as such, and therefore the Court should deny Defendant's motion.

**A.     The Apportionment Analyses of Dr. McClellan and Dr. Lomp Apply Well-Known Methodologies, Are Tied to the Facts of the Case, and Should Not Be Excluded.**

**1.     Dr. McClellan's Apportionment Analysis.**

Dr. McClellan's apportionment analysis is based on the widely accepted Feature Importance Ranking Measure or "FIRM" methodology. This method has been used for years in academia and industry to value product features, particularly in the case of large learning models. Zien, Alexander, *et al*., *The Feature Importance Ranking Measure* (Oct. 22, 2018), *available at* https://arxiv.org/pdf/0906.4258. Because of the lack of available data produced by LGL and the context of the case (*i.e.*, apportionment rather than a large learning model), Dr. McClellan tailored the FIRM method for his apportionment analysis. More specifically, Dr. McClellan used a weighted average of particular features within feature sets that were identified by LGL and

supported by verifiable third-party survey data, as well as LGL surveys and advertisements. LGL alleges that this model has an unknown error rate, hasn't been published for peer review, is unreliable and Dr. McClellan is not an economist or survey expert and therefore is incapable of performing such an analysis in any case.[1] Mot. at 7-9. LGL's complaints are red herrings (at best) and easily disproven.

For example, the fact that Dr. McClellan is not an economist is irrelevant, as he has performed many such analyses and followed industry guidelines like those explained in the Zien article published about the FIRM method written for the Proceedings of the European Conference on Machine Learning and Principles and Practice of Knowledge Discoveries in Databases. This and other articles[2] about the FIRM method were cited in Dr. McClellan's report and describe the objective nature and process of determining feature sets and their relative importance. *E.g.*, Ex. 3 (McClellan Rpt.) § II.E.2. Further, Dr. McClellan modified the method to *use weighted averages*, a mathematical approach that anyone with an understanding of math can understand. Ex. A (McClellan Tr.) at 199-200 ("[T]he general approach is generally accepted . . . it's just a weighted contribution. It's just a weighted sum or a weighted average . . . applying that concept to the problem of apportionment in a legal case."). Dr. McClellan further explained,

> [f]irst there is the mathematical technique. That mathematical technique is tried and true in all kinds of scientific papers, right. You could call it a mean opinion

---

[1]  LGL erroneously asserted that Dr. McClellan "took pains to emphasize that he is not an economist, has no experience conducting surveys, and is not an expert in conducting or analyzing consumer surveys to assess consumer preferences." Mot. at 5. In fact, he answered each of LGL's roughly 20 questions on the subject, and confirmed that he has taught courses and presented on engineering economics. Exhibit A (McCellan Tr.) at 37:16-38:14.

[2]  Other articles published about the method and cited by Dr. McClellan include van der Laan, M., *Statistical Inference for Variable Importance*, The International Journal of Biostatistics, Vol. 2, Iss. 1 (2006), *available at* https://doi.org/10.2202/1557-4679.1008; and Neyman, J. and Pearson, E.S*., On the problem of the most efficient tests of statistical hypotheses*, Philosophical Transactions of the Royal Society of London, Series A. 231:289–337 (Feb. 16, 1933), *available at* https://doi.org/10.1098/rsta.1933.0009.

score. You could call it a weighted average, whatever you want to call it. It's a tried-and-true technique. So, the application of that technique to the problem of apportionment in a patent case was taught to me by some lawyers in a different case . . . because their process was—as applied to apportionment, their process was almost identical to similar processes that I had done previously in industry, in academia and other places . . . I adopted their process and I have used it in multiple cases.

*Id.* at 200-201. Following this description, Dr. McClellan explained that he had used survey or poll data—including some produced by LGL—and averaged those to get the overall technical value. *Id.* at 219-220; *see also* Ex. 3 (McClellan Rpt.) ¶¶ 131-132 & Table 1.

More specifically and using the '443 Patent's analysis as an example, Dr. McClellan started with LGL and Motorola surveys that were produced during discovery. *See, e.g.*, Ex. 3 (McClellan Rpt.) ¶¶ 151-152. Although there were only a handful of such documents, Dr. McClellan also utilized publicly available surveys to confirm the feature sets identified by Defendant's survey and marketing documents and then performed analysis of those features. *Id.* at nn. 10-12, 14-16; *see also id.* ¶¶ 165-167. After determining the features via this process, Dr. McClellan performed an "average of the polls based on how many respondents there were. So it was a weighted average based on the number of respondents" in order to get a "Technical Weight." Ex. A (McClellan Tr.) at 222:8-13. Then Dr. McClellan created an "Attributable Value" for each feature set, which simply represents the relative importance of that feature based on the averaging of the polling data. Ex. 3 (McClellan Rpt.) ¶¶ 145-146.[3] Finally, Dr. McClellan

---

[3]  LGL claims that these attributions were created out of whole cloth based on only Dr. McClellan's "judgment, insight, and substantial experience," however, that is not the case at all. The quote that LGL uses for this premise is a boiler plate sentence from McClellan's report noting that the numerical weight assigned to the features "*may*" be based on those things. Ex. 3 (McClellan Rpt.) ¶ 145. But LGL ignores the numerous paragraphs cited above reflecting the basis for Dr. McClellan's apportionment in a thinly veiled effort to minimize the complexity of Dr. McClellan's methodology. "[W]here an expert explains the facts underlying his apportionment percentages, how they connect to his apportionment percentages, and the methodology he used to arrive at his apportionment percentages his apportionment rates are

created a "Relative Contribution" for each feature set, which reflects the percentage of the Accused Functionality performed or attributable to the various features. As explained by Dr. McClellan, to achieve this, you simply multiply the technical weight by the attributable value which gives you the apportioned result per feature. Ex. A (McClellan Tr.) at 197:4-21.

There is nothing unreliable about this method, as it is based on simple mathematics; it identifies infringing and non-infringing components, and assigns a weight to the infringing features/components. *WhereverTv, Inc. v. Comcast Cable Communications, LLC*, No. 2:18-cv-529-JLB-NPM, 2022 WL 2115487, *4 (M.D. Fla. Jun. 9, 2022) (ruling that a "top level component counting" analysis was reliable methodology for a technical expert to use, where the technical expert "identified the accused device's top level components, distinguished which components were infringing and non-infringing, and assigned a weight to each of these components based on the degree to which the component in question contributed to the infringement alleged") (internal quotations omitted). Further, the basis for this methodology is described in his report, including his reasoning and identification of infringing features. Ex. 3 (McClellan Rpt.) § II.E.2. In fact, as Dr. McClellan noted in his deposition "the only thing that would be needed to duplicate this exact set of data would be what features went into ancillary features . . . ." Ex. A (McClellan Tr.) at 222:22-223:4. And ancillary features were discussed in depth at Dr. McClellan's deposition, explained generally in his report, and will certainly be the subject of cross examination, so the entire exercise is both objective and repeatable.

Nevertheless, LGL cherry picks soundbite excerpts from Dr. McClellan's deposition in an effort to muddy the water and make it seem like "he has no methodology or explanation for

---

not pulled out of thin air, and his report will be found reliable." *See WhereverTv, Inc. v. Comcast Cable Communications, LLC,* 2022 WL 2115487, *5 (M.D. Fla. Jun. 9, 2022).

(1) which features were worthy of counting in his apportionment and (2) why other features were admittedly ignored." Mot. at 9. But as outlined above, that is not the case. The features Dr. McClellan selected for inclusion in the analysis were those features in Defendant's marketing material and surveys which were highlighted as important or desirable related to the accused functionality as supplemented with public data from consumer polls and surveys. No important features were "ignored" as LGL implies. Mot. at 9; *Smart Path Connections, LLC v. Nokia of America Corp.*, No. 2:22-cv-0296-JRG-RSP, 2024 WL1096093, *3 (E.D. Tex. Mar. 13, 2024) ("[T]here is no perfect apportionment and [the expert] has apportioned to individual features at the level Nokia advertises.").

This method has been sanctioned by courts throughout the country and has none of the hallmarks of a "black box" analysis or one that is scientifically unreliable. For example, in *Smart Path*, the court ruled that an expert's "technique of counting entire features that infringe to reach his opinion rather than attempting to further apportion within the features" is "sufficient" to overcome a *Daubert* challenge. *Smart Path,* 2024 WL1096093, at *3. Similarly, here Dr. McClellan utilized features *highlighted by Defendant as important*, confirmed those using publicly available information and created a weighted average of "contribution" of those features to infringement. Ex. 3 (McClellan Rpt.) § II.E.2.

To the extent that LGL complains about the use of public surveys, that too has been sanctioned by courts as an acceptable use of public data in apportionment analysis. For instance, in *SB IP Holdings*, the court allowed an expert to rely on survey evidence, noting that "the surveys were relevant to and informed Dr. Akl's opinions through his report" and because they "employ the expert's expertise to help the jury understand facts or issues beyond a lay person's understanding" reliance on the surveys was acceptable. 2023 WL 6601415, at *3. Moreover, the

whole point of an expert's apportionment analysis is that the ultimate award must be based on the incremental value that the patented invention adds to the product," *id.* at *2, and so long as there is a cognizable and well-articulated methodology any "critique of methodology" is more appropriate for cross-examination rather than a motion to exclude, *id*. at *3.

For the same reasons that Dr. McClellan's '443 patent apportionment—as discussed above—is appropriate, so too is his analysis of the server patents. The only significant difference between the two is the availability of LGL surveys discussing important features of the accused server products. LGL did not produce any surveys, customer polls or anything similar during discovery. Dr. McClellan compensated for this by using information from well-respected publications discussing the accused functionality as described in product briefs and brochures *produced by Defendants*. Ex. 3 (McClellan Rpt.) § III.E.2. The public information in this case was from sources such as TRC (a well-known market research company), De Gruyteer Brill (an academic publishing company since the 17th century), Cisco publications, Securitas Technology publications, and Datacore and Information Technology Intelligence Consulting, among others. *Id.* These sources were used to correlate the features of the accused server products advertised by LGL with those that consumers find desirable during purchasing.

In addition, Dr. McClellan used his industry experience in building out data centers, including provisioning the servers therein across multiple vendors to aid in his apportionment process. Although personal experience is not on its own a substitute for empirical data, Dr. McClellan's use of his extensive experience in the data center space was utilized to confirm the available data rather than as a substitute for it. *See, e.g.*, *Voxer, Inc. v. Meta Platforms, Inc.*, No. 1-20-cv-00655-LY-SH, 2022 WL 3371634, *3 (W.D. Tex. Aug. 16, 2022) ("Mitzenmacher's work, teaching, and research experience in the scientific fields related to the issues raised in the

7

case reasonably indicate to the court, operating in a gatekeeping capacity, that Mitzenmacher is qualified to render opinions in this action based on his knowledge, skill, experience, training or education. The court finds that based on the flexible nature of the court's *Daubert* inquiry, the issues raised by Meta may be explored and developed at trial through cross-examination of Mitzenmacher."); *see also*, *Personal Audio, LLC v. Google LLC*, No. 17-1751-CFC-CJB, 2021 WL 5038740, *4 (D. Del. Oct. 25, 2021) ("*Daubert* does not actually require outside research as long as Dr. Hampton has relied on data of the type reasonably relied on by experts . . . in his field.") (citing *Wonderland Nursery Goods Co. v. Thorley Indus., LLC*, No. 12-cv-196, 2013 WL 6328772, at *4 (W.D. Pa. Dec. 5, 2013)).

The facts of this case are unlike those in *NetFuel, Inc. v. Cisco Sys. Inc.*—relied on by LGL—where the court found inadmissible an expert's opinion offering only vague, qualitative descriptions without some indication as to the weight or value attributed to each feature. No. 5:18-cv-02352-EJB, 2020 WL 1274985, at *8 (N.D. Cal. Mar. 17, 2020). Here, Dr. McClellan used *LGL's own* survey, polling and marketing information to assign a weighted average to the accused products' main features before assigning an attributable value and arriving at a relative contribution by multiplying the two values. Ex. 3 (McClellan Rpt.) § II.E.2. Unlike the expert's analysis in *NetFuel*, this ties the apportionment to the facts of the case, uses well-known and reproduceable methodology and arrives at an apportioned assessment of only the incremental value added as a result of the patents-in-suit. With respect to the server patents, Dr. McClellan used empirical data of the type normally relied upon by experts in the field and prior industry experience to select features implicated by the asserted patents. *Id*. He explained his reasoning in his report and during his deposition, and unlike the facts in *NetFuel*, attributed specific weighted values to the product features used to arrive at the value added by the asserted patents.

8

Accordingly, contrary to LGL's allegations, Dr. McClellan's apportionment analysis not only satisfies the requirements set forth by this Court and the Federal Circuit, but it goes beyond the minimum and provides a well-reasoned and scientifically-based apportionment using the best data and information available, and therefore, Defendant's motion to exclude it should be denied.

### 2.   Dr. Lomp's Apportionment Analysis.

Dr. Lomp's apportionment opinions for the '439 and '835 patents are based on established, evidence-based methods and extensive analysis of relevant documentary evidence.

As to the '439 patent, Dr. Lomp uses the results of scientific experiments that were performed when the claimed invention was first incorporated into the IEEE 802.11 Wi-Fi standard in order to determine how much of the value of the standard as a whole is specifically attributable to the "cyclic advance" technique that is covered by the Asserted Claims, and to assess the incremental value of "cyclic advance" relative to its closest alternative, "cyclic delay." For example, Dr. Lomp's report includes a detailed analysis of experiments that compared the performance of two Wi-Fi systems that were identical in every respect except that one used the claimed cyclic advance while the other used cyclic delay. *See* Ex. 6 (Lomp Supp. Rpt.) ¶¶ 58-66, ¶¶ 154-156. As Dr. Lomp explains in his report, these experimental results demonstrate that the use of cyclic advance instead of cyclic delay can reduce transmission errors by a significant margin. *Id.* ¶ 157.

Dr. Lomp also provides a detailed description of the relevant Wi-Fi standards and their key features. *See id.* ¶¶ 76-83. In particular, Dr. Lomp identifies unclaimed features of the standard that contribute significant value, such as "spatial multiplexing, spatial diversity, beamforming, and advanced error correction strategies." *Id.* ¶ 163.

Thus, Dr. Lomp's apportionment opinion for the '439 patent is based not only on his undisputed expertise in the relevant field, but also on extensive, evidence-based analysis that

isolates the claimed invention from the other features present in the relevant Wi-Fi standards and measures the invention's value relative to its closest non-infringing alternatives.

LGL's objections to Dr. Lomp's '439 patent apportionment analysis are without merit. For example, LGL asserts that Dr. Lomp's apportionment analysis is "a total of four paragraphs," when in fact more than 30 paragraphs of Dr. Lomp's report relate to apportionment. Mot. at 5; *see* Ex. 6 ¶¶ 56-80, ¶¶ 148-164. LGL also claims that Dr. Lomp reaches his opinions "without any analysis or support," when in fact Dr. Lomp's apportionment opinions are based on extensive analysis of evidence from numerous sources, as explained above. *Id.* Finally, LGL suggests that Dr. Lomp fails to account for the value of "cyclic delay diversity" in the 802.11 Wi-Fi standard, even though the 802.11 standard does not include any "cyclic delay diversity" at all, as Dr. Lomp confirmed at his deposition. *See* Exhibit B (Lomp Tr.) at 205:10-16.

Dr. Lomp's apportionment opinions for the '835 patent are also based on established methodologies and are clearly tied to the facts of the case and to the relevant LPDDR memory standards. For the '835 patent, unlike the '439 patent, experimental evidence isolating the claimed invention from the rest of the relevant standard was not available. As a result, Dr. Lomp's apportionment analysis for the '835 patent uses a combination of established techniques to determine the proportion of the overall value of the LPDDR standard that is attributable to the claimed invention. In particular, Dr. Lomp first used a "Lines of Code (LOC)" technique to calculate the aggregate number of pages relating to the claimed invention, with each page weighted depending on whether its contents are "functional" or "structural." *See* Ex. 6 (Lomp Supp. Rpt.) ¶¶ 479-486. Dr. Lomp then combined this result with the result of a "Function Point Analysis (FPA)" approach, based on the proportion of the sections/subsections in the standard that relate to the claimed invention, with each section weighted depending on whether its

10

contents are "functional" or "structural." *See id.* As Dr. Lomp explains, both the "LOC" and "FPA" metrics are well-known in the engineering field. *See id.* ¶ 484.

LGL insinuates that Dr. Lomp's '835 patent apportionment analysis is somehow suspect because it differs from his approach to the '439 patent. *See* Mot. at 5 (complaining that "Dr. Lomp used different 'methodologies' across the '439 and '835 Patents"). However, as explained above, while there is direct experimental evidence relating to apportionment for the claimed features of '439 patent in the context of the Wi-Fi standard, there is no such evidence for the '835 patent. As a result, Dr. Lomp's apportionment analysis for the '835 patent necessarily differs from his approach to the '439 patent. These differences, far from being reason to doubt the reliability of Dr. Lomp's apportionment opinions, instead confirm that Dr. Lomp's opinions for both patents are tailored to the available facts and based on the best available evidence.

In its brief, LGL claims repeatedly that Dr. Lomp "acknowledged that he could not recreate his analysis" for the '835 patent. Mot. at 6; *see also id*. at 10. This is false. In fact, Dr. Lomp merely explained that it would be impossible to reproduce his analysis "in realtime" *during his deposition*. *See* Exhibit B (Lomp Tr.) at 175:21-176:7.

Thus, for the reasons given above, Dr. Lomp's apportionment opinions relating to the '439 and '835 patents are based on established and reliable methodologies using the best available evidence, and Defendant's *Daubert* motion should be denied.

### B.    Mr. Blok Properly Relies on the Opinions of Dr. McClellan and Dr. Lomp.

#### 1.    Mr. Blok's Reliance on Dr. McClellan's Opinions.

Defendant's sole criticism of Mr. Blok's royalty analysis for the '140, '016, and '443 patents is his reliance on Dr. McClellan's apportionment. For the reasons stated in Section I.A.1 alone, the Court should deny this aspect of the Motion. Moreover, as explained below, Mr. Blok's reliance on Dr. McClellan's apportionment does not render his analysis inadmissible.

As an initial matter, Mr. Blok is a damages expert, not a technical expert, and is permitted to rely on Dr. McClellan's apportionment analysis. *See, e.g.*, *LongHorn*, 2022 WL 903934, at *3 ("[I]t is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert") (citations omitted); *Realtime Data LLC v. EchoStar Corp.*, No. 6:17-cv-00084-JDL, 2018 WL 6266301, at *9 (E.D. Tex. Nov. 15, 2018) ("[A] damages expert may still rely upon technical 'inputs' as part of the basis for an independent economic analysis"); *Salazar v. HTC Corp.*, No. 2:16-cv-01096-JRG-RSP, 2018 WL 1783157, at *2 (E.D. Tex. Apr. 13, 2018) ("Indeed, damages experts calculating a reasonable royalty routinely rely on facts or data from a party's technical expert"). LGL cites no authority requiring a damages expert to independently recalculate or modify a technical expert's apportionment analysis. Rather, Mr. Blok appropriately considered Dr. McClellan's apportionment as one of many inputs in forming his royalty opinion.

LGL alleges that Mr. Blok simply "adopted" the results of Dr. McClellan's apportionment analysis. This is untrue. Mr. Blok thoroughly analyzed several different reasonable methodologies that the parties would have likely considered during the hypothetical negotiation. *See* Ex. 7 (Blok Rpt.) Appx. C ¶¶ 17-22. Through this analysis, Mr. Blok concluded that a per-unit royalty for the '443, '140 and '016 Patents must focus solely on the features attributable to the asserted patents and the benefits realized by Lenovo from incorporating these patented technologies in the Accused Server Mobile Devices. *Id.* Appx. C ¶ 75. To measure the incremental benefits conferred by the asserted patents, Mr. Blok appropriately relied on Dr. McClellan's technical apportionment. *See id.* ¶ 77.

Mr. Blok's analysis did not start and/or end with Dr. McClellan's apportionment. Mr. Blok began his royalty analysis by calculating: (1) the average sales price of the Accused

Products; and (2) the costs associated with the manufacturing/production of the Accused Products. Then Mr. Blok calculated the profits attributable to the Accused Products. After applying Dr. McClellan's technical apportionment, he further considered the parties' respective bargaining positions as informed by the *Georgia-Pacific* factors to determine an appropriate split of the apportioned economic benefit from the asserted patents. *See id.* ¶ 94. He then applied that split to calculate a reasonable royalty. Thus, Mr. Blok's opinion reflects a thorough and independent economic analysis, not a mere adoption of Dr. McClellan's work.

LGL's reliance on *Realtime Data v. Oracle*, 2017 WL 11574028, is unavailing and does not support exclusion. In *Realtime v. Oracle*, the court rejected a damages expert's opinion because it merely adopted a technical apportionment figure as the final royalty basis without conducting any independent economic analysis. *Id.*, at *5. As explained above, Mr. Blok did not start or end his analysis with Dr. McClellan's apportionment figure. In fact, *Realtime v. Oracle* reaffirmed that technical apportionment values may serve as inputs for a damages expert's economic analysis. *Id.*, at *5 ("[O]pinions about the technical value of the accused products . . . may be an input into the damages expert's opinion about the proper apportionment value."); *see also, Salazar*, 2018 WL 1783157, at *2 ("Indeed, damages experts calculating a reasonable royalty routinely rely on facts or data from a party's technical expert").

Courts have also recognized that technical and economic contributions often overlap, particularly when the patented features appear in marketing materials promoting the accused products. *See Cioffieta v. Google, Inc.*, No. 2:13-cv-00103-JRG-RSP, 2017 WL 77395, at *3 (E.D. Tex. Jan. 9, 2017). Both Mr. Blok and Dr. McClellan reviewed and relied on Lenovo and Motorola Mobility marketing documents in evaluating the significance of the patented features to LGL and its customers. This aligns with the reasoning in *Cioffieta*, where the court found that

13

technical attributes identified by a technical expert also bore economic relevance because they were included in product marketing. *Id*. The court rejected the argument that the apportionment value was "plucked out of thin air," finding instead that the expert's reliance on marketing materials supported the value's foundation in both technical and economic terms. *Id.*

Accordingly, Mr. Blok reasonably relied on Dr. McClellan's analysis to provide a basis for his apportionment of the Accused Server and Mobile Devices. For the foregoing reasons, LGL's motion to exclude should be denied.

### 2.    Mr. Blok's Reliance on Dr. Lomp's Opinions.

In addition to the reasons set forth above, LGL's motion to exclude Mr. Blok's opinions based on Dr. Lomp's apportionment analysis should be denied for the following reasons.

As with his analyses of the '140, '016, and '443 patents, Mr. Blok performed a comprehensive damages analysis of the *Georgia-Pacific* factors for the '439 and '835 patents. As discussed above, this analysis did not start and/or end with Dr. Lomp's apportionment. Mr. Blok began his analysis by calculating: (1) the average sales price of the smallest salable patent practicing unit (i.e., WiFi Chip); and (2) the costs associated with the manufacturing/production of the SSPPU.  Then Mr. Blok calculated the profits attributable to the SSPPU.  He again concluded that a per-unit royalty must be based on the incremental benefits attributable to the asserted patents. Ex. 7 (Blok Rpt.) Appx. A ¶¶ 113-118, Appx. B ¶¶ 101-106. Rather than performing his own technical analysis to identify which product features are attributable to the asserted patents, Mr. Blok appropriately relied on Dr. Lomp's technical apportionment analysis. *See id.* Of course, an economic expert may rely on the technical opinions of a qualified expert regarding the significance and value of patented features. *See LongHorn*, 2022 WL 903934, at *3; *Realtime Data v. Google*, 2018 WL 6266301, at *9; *Salazar*, 2018 WL 1783157, at *2.

14

Mr. Blok's economic analyses for the '439 and '835 Patents are consistent with the apportionment methodology sanctioned by the court in *In re Innovatio*, *LLC Patent Litigation*, No. 11-c-9308, 2013 WL 5593609 (N.D. Ill. Oct. 3, 2013), as an accepted means for calculating a RAND rate. *Id.*, at *38 ("Dr. Leonard's method provides some quantitative and analytical rigor to the RAND analysis. The method requires verifiable data points, such as the number of 802.11 standard-essential patents, the average price of a chip, and the average profit of a chip manufacturer, as inputs. Dr. Leonard's method thus allows the court to base its RAND rate on objective considerations and sound hypotheses, rather than on mere speculation"). As there by Dr. Leonard, Mr. Blok began his apportionment analysis with the average price of a Wi-Fi chip and based on that average price he calculated the average manufacturer's profit per Wi-Fi chip. *See id.* Both Mr. Blok and Dr. Leonard then multiplied the average profit by an apportionment figure. *Id.* By taking this approach, Mr. Blok supplied additional economic data points to Dr. Lomp's apportionment analysis for the court to consider, thereby adding "quantitative and analytical rigor to the RAND analysis." *See id.*

LGL's assertion that Mr. Blok failed to apply economic expertise and merely paid "lip service" to the *Georgia-Pacific* factors is conclusory and unsupported. During his deposition, Mr. Blok explained his application of each *Georgia-Pacific* factor, and specifically noted that, under Factor 13, the apportionment analysis had a downward effect on his reasonable royalty calculation. *See* Ex. C (Blok Tr.) at 111:9-18. Dr. Lomp's apportionment analysis is just one component of Mr. Blok's broader damages assessment, which he properly considered in forming his opinion. LGL has not shown that Mr. Blok's opinion should be excluded under Rule 702. Whether Mr. Blok was correct to rely on Dr. Lomp's analysis is ultimately a question for the jury. *See Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015).

15

II.     **IV'S ARGUMENTS THAT THE '835 AND '439 PATENTS ARE STANDARD-ESSENTIAL WERE TIMELY DISCLOSED AND SHOULD NOT BE STRICKEN**

LGL alleges that IV identified the '835 and '439 patents as standard-essential "for the first time" in its expert reports, and that "throughout fact discovery IV staunchly contended that the '835 and '439 patents were **not** standard essential." Mot. at 15 (emphasis in original).

These allegations are false. IV clearly and unambiguously identified the '835 and '439 patents as standard-essential in its Final Infringement Contentions, which were served on LGL on June 4, 2024—over a year ago, and more than six months before the close of fact discovery in this case. Moreover, despite LGL's claims to the contrary, IV has never stated or suggested that either of these patents are not standard-essential.

LGL's motion to strike the opinions of IV's experts regarding standard-essentiality is based entirely on these false allegations and should therefore be denied.

A.     **IV Explicitly Identified the '835 and '439 Patents as Standard-Essential in its Infringement Contentions.**

IV's Final Infringement Contentions, served on June 4, 2024 identify the '835 and '439 patents as standard-essential.

For example, with regard to the '835 patent, IV's contentions state "[a]s explained herein, devices that implement the LPDDR4/LPDDR4X, and LPDDR5 standards satisfy the requirements of the Asserted Claims." Exhibit D (IV's Final Infringement Contentions, Ex. E) at 7. Following this notice, IV's contentions include a limitation-by-limitation analysis of the Asserted Claims of the '835 patent, explicitly mapping each limitation to specific portions of the relevant standards documents. *See id.* at 11-77:

16



The first page of this analysis, reproduced above, identifies "JEDEC Standard No. 209-4 (LPDDR4)" and "JEDEC Standard No. 209-5A (LPDDR5)" as relevant standards, and includes an image of the cover of the LPDDR5 standard in the bottom right corner. *Id.* at 11.

Similarly, with regard to the '439 patent, IV's contentions state "[a]s explained herein, devices that implement the IEEE 802.11n and/or the IEEE 802.11ax standards including cyclic advance diversity functionality satisfy the requirements of the Asserted Claims." Exhibit E (IV's Final Infringement Contentions, Ex. A-1) at 3; *see also* Exhibit F (IV's Final Infringement Contentions, Ex. A) at 3; *see also* Exhibit G (IV's Final Infringement Contentions, Ex. A-2) at 3. Following this notice, IV's contentions include a limitation-by-limitation analysis of the Asserted Claims of the '439 patent, explicitly mapping each limitation to specific portions of the relevant standards documents. *See id.* at 4-50:

17



The first page of this analysis, reproduced above, is titled "Related Standards," identifies "IEEE Standard 802.11n-2009" and "IEEE Standard 802.11-2007" as relevant standards, and includes pictures of the covers of both of these standards documents. *Id.* at 4. The page also states that IV's infringement arguments are not specific to any particular implementation or device, but apply to "all implementations" of the relevant standards. *Id.*

As demonstrated above, IV's infringement contentions leave no room for doubt as to IV's position that the '835 and '439 patents are standard-essential. In light of this disclosure, LGL's claim that it learned of these arguments "for the first time" in IV's expert reports fails.

## B.    IV's Position Has Remained Consistent Throughout this Litigation.

Ignoring IV's explicit disclosure of its standard-essential contentions, LGL mischaracterizes several discovery events to support its erroneous argument that IV "repeatedly urged that the '835 Patents and '439 (sic) were not standard essential." Mot. at 15. First, LGL

points to deposition testimony of IV fact witnesses, Steven Joroff and Peter Detkin. As an initial matter, while Mr. Joroff was IV's corporate representative in response to LGL's 30(b)(6) topics, none of those topics required a witness to be prepared to answer whether IV contended any of the patents-in-suit were standard-essential, so he was answering in his personal capacity. *See infra* §VI. Regardless, in the excerpt from Mr. Joroff's deposition cited by LGL, Mr. Joroff explained that to his knowledge he did not know of any patents affirmatively deemed standard-essential, which, to his understanding, requires a vetting process. Ex. H (Joroff Tr.) at 99:22-100:2. Mr. Joroff was not asked if IV was contending in this case that the patents-in-suit were standard-essential. Indeed, Mr. Joroff went on to testify that he was not aware of IV having a process to determine whether a patent is standard-essential. *Id.* at 102:15-21.

Similarly, Mr. Detkin, testifying in his personal capacity, did not know if the patents-in-suit were standard-essential, and testified only that he believed IV has acquired standard-essential patents as part of its larger portfolio. *See* Ex. 8 (Detkin Tr.) at 89: 9-12, 90:4-9.

LGL also alleges that "IV told other licensees it did not consider the '439 Patent to be standard essential," pointing to an IV document dated September 15, 2020, from licensing discussions with another party. Mot. at 15. But the document cited by LGL says no such thing. Instead, it speculates as to why the '439 patent *may* not have been declared to the IEEE as a potentially essential patent prior to the promulgation of the 802.11 standard. Ex. 10 (Lenovo-00022147). Nowhere in the cited document did IV affirmatively state the '439 patent was *not* standard-essential. Regardless, as demonstrated above, IV's infringement contentions clearly stated IV's position regarding standard-essentiality, and supersede any such statements.

LGL attempts similar misdirection with respect to a letter exchange between the parties, arguing that IV was somehow claiming the '439 patent is not standard-essential. Those

19

communications, however, did not address the question of essentiality. Instead, it focused on whether IV's predecessor in interest to the '439 patent ███████████████████ ████████████████████████████████ As explained by IV in the letter cited by LGL, the ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████ *See* Ex. 12 (IV 2024-12-16 Ltr. to K. Geyer).

Further, and notably, IV's letter to Ms. Geyer was written in response to an inquiry from LGL's counsel that refers to the IEEE 802.11 standards as "standards accused by IV of infringement." Exhibit I (2024-12-04 Ltr. to A. L'Esperance). This bears repeating: LGL's counsel referred to the "standards accused by IV of infringement." This shows that LGL was already aware of IV's position that the '439 patent was standard-essential by December of 2024, and belies its argument that it learned of these arguments "for the first time" in IV's expert reports, served months later.

Notably, LGL never propounded an interrogatory asking whether IV planned to argue that the '439 or '835 patents are standard-essential, as it did in *Universal Connectivity*. *Universal Connectivity Techs. Inc. v. Lenovo Grp. Ltd.*, No. 2:23-cv-00449-JRG, 2025 WL 1144734, at *3 (E.D. Tex. Apr. 15, 2025). Given the explicit disclosures in IV's infringement contentions described above, the absence of such an interrogatory is not a surprise. LGL did not need to ask the question because it already knew the answer.

In the end, there is no support for LGL's claim that IV "repeatedly urged that the '835 Patents and '439 (sic) were not standard essential." If anything, the documents cited by LGL only serve to confirm that it was aware of IV's position on the issue long before it received IV's expert reports.

20

### III.    MR. BLOK'S DAMAGES OPINIONS FOR THE '835 AND '439 PATENTS SHOULD NOT BE EXCLUDED

Even if the '835 and/or '439 patents were found to be non-essential to their respective standards, or if Dr. Lomp's opinions regarding essentiality were to be stricken, Mr. Blok's damages opinion as to these two patents would remain admissible.

An infringement damages award must reflect only the value attributable to the patented technology. Therefore, any value derived from inclusion in a standard or from other technologies within the accused device must be excluded. By focusing his analysis on the smallest salable patent-practicing unit ("SSPUs") (i.e., the Wi-Fi chip) as implemented in the Accused Devices, Mr. Blok's analysis appropriately isolates the value of the '835 and '439 patents.

More specifically, Mr. Blok refines his analysis by focusing on the profits realized by the SSPU manufacturers. *See* Ex. 7 (Blok Rpt.) Appx. A ¶ 95. This provides a sound basis for not only calculating a reasonable royalty under a RAND framework, but also a proper royalty base for isolating the claimed elements from the Accused Devices. To further apportion the infringing components, Dr. Blok appropriately relies on Dr. Lomp's apportionment analyses which uses the Wi-Fi and LPDDR standards as proxies for the infringing SSPUs in the Accused Products. In other words, by apportioning value relative to the standard, Dr. Lomp also apportions value relative to the chip that implements the standard. Indeed, in his report, Dr. Lomp specifically *excludes* any value the claimed inventions might derive solely by virtue of their incorporation into the standard, leaving only the technical value of the claimed inventions as compared to available alternatives. *See* Ex. 6 (Lomp Supp. Rpt.) ¶¶ 153-164, ¶¶ 490-495.

Accordingly, by limiting his analysis to the economic benefit of the infringing chip from the manufacturer's perspective, Mr. Blok excludes any technical or economic value attributable to Lenovo's contributions to the Accused Devices. This analysis would remain admissible even

21

if the '439 and '835 Patents were to be found non-essential, and as such, Lenovo's motion to exclude Mr. Blok's damages opinions as to the '835 and '439 patents should be denied.

## IV.    IV IS NO LONGER ASSERTING THAT OPENVPN INFRINGES ANY PATENT CLAIM

While IV stands by its original assertion of infringement of the Accused Server Patents by OpenVPN, to reduce the number of issues before the Court, IV is no longer asserting that OpenVPN infringes any patent claim.

## V.    DR. LOMP DID NOT INTRODUCE A NEW THEORY OF INFRINGEMENT FOR THE '835 PATENT

LGL alleges that Dr. Lomp identifies entirely different features as the claimed "sampling signals" from those that IV identified in its Final Infringement Contentions for the '835 patent ("835 FICs"). Mot at 22-23. LGL's allegation is meritless because, as described below, it is based on a fundamental misunderstanding of and confusion between the '835 FICs' and Dr. Lomp's analysis of two different elements of claim 1 of the '835 patent, namely, "signals" and "systematically altering."[4]

### A.    Background.

The '835 patent is generally directed to methods and systems for calibrating the timing relationships between certain signals associated with an integrated circuit device, such as a memory. Ex. 6 (Lomp Suppl. Rep.) ¶¶ 171-172. In the operation of a low-power, double data rate (LPDDR) memory, three signals that are relevant to the claims of the '835 patent are command/address (CA), data (DQ), and sampling (DQS for LPDDR4/4X memories and WCK and RDQS for LPDDR5 memories). Id. ¶¶ 191, 285. For a substantially error-free operation of an LPDDR memory, these signals are calibrated and synchronized with respect to each other via

---

[4]    With respect to the claim limitations discussed herein, the other independent claims (i.e., claims 7, 12, 20, and 23) recite similar limitations.

three types of trainings. *Id.* ¶¶ 192, 286. For LPDDR4/4X memories, the three trainings include Command Bus Training (CBT), Write Leveling (WL), and DQS-DQ Training, also called DQ Bus Training (DQBT), and for LPDDR5 memories, the three trainings include CBT, WCK2CK Leveling (WCK2CKL), and WCK-DQ Training, also called DQBT. *Id.* ¶¶ 186, 191, 204-239, 285, 299-333.

IV's '835 FICs and Dr. Lomp both consistently rely on sending / receiving the above-identified three signals, and *not on any training*, as meeting the claim elements [1.a] "generating command signals," [1.b] "accessing data signals," and [1.c] accessing sampling signals. *See* Ex. 17 (835 FICs) at 14, 17; Ex. 6 (Lomp Suppl. Rep.) ¶¶ 187-203, 281-298. The '835 FICs and Dr. Lomp both consistently rely on the above-identified three *trainings* as meeting the claim element [1.d] "systematically altering." Ex. 17 ('835 FICs) at 18-23; Ex. 6 (Lomp Suppl. Rep.) ¶¶ 204-239, 299-333. As such, contrary to LGL's false allegation, *see* Mot at 23, Dr. Lomp has not presented a new infringement theory for claim element [1.c], as further discussed below.

**B.    Argument.**

**1.    835 FICs State that Claim Element [1.c] Is Met by Providing DQS Signals for LPDDR4/4X and WCK Signals for LPDDR5.**

Regarding claim element "accessing sampling signals"[5] LGL states that '835 FICs "point to a *training feature* known as WCK2CK Leveling." Mot at 22 (citing Ex. 17 (835 FICs) at 14, 20). This is plainly not true. The relevant portion of the '835 FICs' page 14 is reproduced below:

---

[5]    LGL refers to this claim element as "'limitation 1[c].'" Mot. at 22. Dr. Lomp refers to the same claim element as "[1.c]." Ex. 6 (Lomp Suppl. Rep.) ¶¶ 201, 295.

Ex. 17 (835 FICs) at 14 (partial). As can be seen, the '835 FICs identify WCK signals of an

LPDDR5 memory as the "sampling signals." Page 14 does not discuss WCK2CK Leveling

training. Page 14 also cites page 6 of JEDEC Standard No. 209-4, which identifies DQS signals

of an LPDDR4/4X memory as "strobe," i.e., "sampling signals." Ex. 18 (JESD 209-4) at 6.

The relevant portions of page 20 of the '835 FICs are reproduced below:

Ex. 17 ('835 FICs) at 20 (partial). As can be seen, page 20 the '835 FICs does not discuss

"accessing sampling signals." Rather, it discusses "systematically altering" and identifies

WCK2CK Leveling as part of "systematically altering," and not as the "sampling signals."

Thus, in arguing that "[w]ith respect to limitation 1[c]," i.e., "accessing sampling

signals," IV's Final Infringement Contentions point to a *training feature* known as WCK2CK

Leveling," Mot at 22, LGL erroneously conflates signals and their systematic altering, where

24

only the latter involves training. This demonstrates LGL's misunderstanding of the '835 FICs and explains in part the flaws in LGL's allegations and arguments.

### 2.    Dr. Lomp's Infringement Analysis Is Consistent with the '835 FICs.

LGL states that Dr. Lomp "points to DQ [Bus] Training as meeting limitation 1[c]," i.e., "accessing sampling signals." Mot at 23 (citing Ex. 6 (Lomp Suppl. Rep.), ¶¶ 201-203, 295-298). LGL also states that "two trainings that Dr. Lomp points to for limitation 1[c] relate to different signal types and serve different purposes than those in limitation 1[c] in IV's final contentions." *Id.* These further allegations are also not true.

Regarding limitation 1[c], Dr. Lomp states that the "LP4 Accused Products," i.e., '835 Accused Products using LPDDR4/4X memory, "'access[ the DQS signals, i.e.,] sampling signals'" by "sending / receiving data strobe signals (DQS)." Ex. 6 (Lomp Suppl. Rep.) ¶ 201 (original formatting omitted). "The LP5 Accused Products," i.e., '835 Accused Products using LPDDR5 memory, "'access[ the WCK and RDQS signals, i.e.,] sampling signals'" by "sending / receiving write clock (WCK) signals and [by] receiving the output clock signals (RDQS) signals." *Id.* ¶ 295 (original formatting omitted).

Contrary to LGL's contention, neither Dr. Lomp nor IV's FICs contend that any training, including DQ Bus Training, by itself, meets limitation 1[c], i.e., "accessing sampling signals." Ex. 6 (Lomp Suppl. Rep.) ¶¶ 201-203, 295-298; Ex. 17 (835 FICs) at 14, 17. Rather, for LP4 Accused Products, Dr. Lomp states that "during Write Training"—which is part of DQ Bus Training—"the DQS signals and the DQS bus are used . . . to strobe (i.e., sample) the data signals (DQ)." *Id.* ¶ 202. He then states that "[t]hus, the *sending of the strobe signals (DQS) using the DQS bus during the Write Training portion of the DQS-DQ Training* comprise[s] 'accessing sampling signals.'" *Id.* (emphasis added) (original formatting omitted). Likewise, for LP5 Accused Products Dr. Lomp states that "during Write Training," which is part of DQ Bus

Training, "the WCK signals and the WCK bus are used … to sample the data signals (DQ)." *Id.* ¶ 297. He then states that "[t]hus, the *sending of the write clock signals (WCK)* using the WCK bus during the Write Training portion of the WCK-DQ Training … comprise[s] 'accessing sampling signals.'" *Id.* (emphasis added) (original formatting omitted).  Thus, Dr. Lomp does not contend that DQ Bus Training, including Write Training, itself constitutes "accessing sampling signals." Rather, consistent with the '835 FICs, Dr. Lomp explains that sending the DQS / WCK signals during DQ Bus Training constitutes "accessing sampling signals." *See id.* ¶¶ 202-203, 297-298; Ex. 17 (835 FICs) at 14 (citing Ex. 18 (JESD 209-4) at 6).

In summary, Dr. Lomp has not introduced any new infringement theory in his Report, and as such, contrary to LGL's arguments, none of the *Tomax* factors apply. *See* Mot at 17, 23 (citing *Tomax AS v. Turbo Drill Indus., Inc.*, 2023 WL 3171744 at *2 (W.D. Tex. 2023). Specifically, IV has not failed to disclose timely its infringement theories because all of Dr. Lomp's infringement arguments are consistent with IV's FICs. An analysis of importance of Dr. Lomp's opinions / arguments is not needed because Dr. Lomp has not presented any previously undisclosed opinions or infringement theories. Likewise, LGL is not prejudiced because all of Dr. Lomp's infringement theories / arguments are consistent with IV's FICs and as such, no continuance is needed, because there is no prejudice to cure and because LGL is not required address any new infringement theory. Therefore, the Court should not strike any portion of Dr. Lomp's Supplemental Opening Report.

## VI.    IV DISCLOSED ITS THEORIES OF, AND SUFFICIENT FACTS REGARDING, SECONDARY CONSIDERATIONS DURING FACT DISCOVERY

IV's interrogatory response was sufficient to disclose IV's theory and, at the appropriate time and in sufficient detail, the relevant facts regarding secondary considerations. That is all that was required: "For interrogatories typically answered in expert reports, the Court's usual practice

26

is to allow a party to defer answering the interrogatory until the corresponding expert report is due." *StratosAudio, Inc. v. Volvo Cars USA, LLC*, No. 6:20-cv-1129-ADA, 2022 WL 1261651, at *3 (W.D. Tex. Apr. 28, 2022). After all, "[t]he critical question in deciding whether to strike portions of an expert report . . . is whether the expert has permissibly specified the application of a disclosed *theory* or impermissibly substituted a new theory altogether." *Pisony v. Commando Constructions, Inc.*, No. 6:17-cv-00055-ADA, 2020 WL 4934463, at *1 (W.D. Tex. Aug. 24, 2020) (quoting *Mobile Telecomms. Techs., LLC v. Blackberry Corp.*, No. 3:12-cv-1652, 2016 WL 2907735, at *1 (N.D. Tex. May 17, 2016)) (emphasis added); *see also, e.g.*, *Sigman v. CSX Corp.*, No. 3:15-cv-13328, 2016 WL 7444947, at *2 (S.D.W. Va. Dec. 27, 2016) ("[I]n cases where the parties anticipate the production of 'an expert report which will touch on the very contentions at issue, the Court should normally delay contention discovery until after the expert reports have been served, which may then render moot any further contention discovery.'") (quoting *BB & T Corp. v. U.S.*, 233 F.R.D. 447, 450-51 (M.D.N.C. 2006)).

Again, the point of contention interrogatories is to disclose theories. One party cannot force the other party to begin its expert analysis early by the simple expedient of serving an interrogatory that asks for expert analysis. When IV answered LGL's interrogatories, IV did not know what evidence of secondary considerations it might rely upon, beyond its own licenses and the technical documents at hand. In *Semcon IP Inc. v. MediaTek Inc.*—LGL's primary case— Judge Payne struck an expert report on secondary considerations where the plaintiff did not provide *any* details: Its response "made no mention of any factual basis for secondary considerations, *or whether Semcon would rely on secondary considerations at all*." No. 2:16-cv-00437-JRG-RSP, 2018 WL 4501871, at *4 (E.D. Tex. Feb. 28, 2018) (emphasis added).

LGL advances the meritless complaint that Mr. Joroff, as IV's Rule 30(b)(6) designee, did not identify evidence other than IV's own licenses. Yes, Mr. Joroff was IV's designee for secondary considerations. But no, IV was not required to force-feed its 30(b)(6) witness *third-party* information to prepare him to answer those sorts of questions. Fed. R. Civ. P. 30(b)(6) ("The persons designated must testify about information *known or reasonably available to the organization*.") (emphasis added). He testified to what IV knew, and that was that. To analogize, LGL was not required to cram into its own 30(b)(6) witness's head knowledge of all of the third-party prior art LGL would rely upon.[6]

Finally, even if there was some failure of disclosure of expert analysis in IV's interrogatory response, there is no harm. LGL has not identified what information it believes it could have gained during fact discovery and what further information and discovery they were hindered from obtaining. The facts are the facts, the documents were produced during discovery, and LGL was able to depose IV's experts about them—indeed, LGL did not even use up the full amount of the allotted time in any of those depositions.[7]

## VII.    CONCLUSION

For the foregoing reasons, Defendant's Motion should be denied, other than with respect to OpenVPN, which is no longer at issue.

---

[6]  Not to put too fine a point on it, but imagine the mischief if a plaintiff could force a defendant to provide a Rule 30(b)(6) witness regarding all facts from all prior art, on pain of exclusion of that prior art.

[7]  Defendant seems to complain that its experts cannot respond to IV's experts. Mot. at 28. That is incorrect—Defendant's expert may respond IV's *rebuttal* report with information outside of Defendant's expert's *opening* report. More to the immediate point, beyond its handwaving, Defendant fails to identify any such additional evidence it might hypothetically have acquired during fact discovery.

Dated: August 4, 2025                    Respectfully Submitted

                                         */s/ Karl Rupp*
                                         Karl Rupp
                                         State Bar No. 24035243
                                         SOREY & HOOVER, LLP
                                         100 N. 6th Street, Suite 502
                                         Waco, Texas 76701
                                         Tel: (903) 230-5600
                                         Fax: (903) 230-5656
                                         krupp@soreylaw.com

                                         Matthew Vella
                                         mvella@princelobel.com
                                         Robert R. Gilman
                                         rgilman@princelobel.com
                                         Jonathan DeBlois
                                         jdeblois@princelobel.com
                                         Brian Seeve
                                         bseeve@princelobel.com
                                         Aaron S. Jacobs
                                         ajacobs@princelobel.com
                                         Suhrid Wadekar
                                         swadekar@princelobel.com
                                         Amanda L'Esperance
                                         alesperance@princelobel.com
                                         PRINCE LOBEL TYE LLP
                                         One International Place, Suite 3700
                                         Boston, MA 02110
                                         Tel: (617) 456-8000
                                         Fax: (617) 456-8100

                                         COUNSEL FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served on all counsel of record via electronic transmission on this 4th day of August, 2025.

                                         */s/ Karl Rupp*